**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **8:25CR64** |
| **Plaintiff,** | |
| **vs.** | **FINDINGS AND** |
| | **RECOMMENDATION** |
| **TYREE DAVIS, and ALANTA** | |
| **PRETENDS-EAGLE,** | |
| **Defendants.** | |

This matter comes before the Court on the Motion to Suppress (Filing No. 46) filed by Tyree Davis ("Davis") and the Motion to Suppress and Request for Hearing (Filing No. 57) filed by Alanta Pretends-Eagle ("Pretends-Eagle"), co-defendants in the above-captioned case. Both defendants move to suppress evidence obtained by law enforcement during the course of a narcotics investigation in January 2025, asserting a number of Fourth Amendment violations.

The Court held several status conferences regarding the motions by telephone with counsel between August 11, 2025, and February 20, 2026. (Filing No. 59; Filing No. 78; Filing No. 79; Filing No. 84). The Court held an evidentiary hearing on the motion on March 27, 2026. (Filing No. 91). Davis was present with his attorney, Keith W. Dornan. Pretends-Eagle was present with her attorney, Jason E. Troia. The government was represented by Assistant United States Attorney, Kimberly C. Bunjer. Omaha Police Department Officers, Mike Sundermeier ("Officer Sundermeier") and Matthew Keenan ("Officer Keenan"), testified at the hearing on behalf of the Government. Davis called his probation officer, Michael Borman ("Borman"), and Anita White-Martin to testify on behalf of the defense. The Court received into evidence, without objection, the government's Exhibits 1 and 2 (Officer Keenan's body-worn camera footage) and Exhibit 5 (the search warrant application, affidavit, and warrant obtained after the dog sniff at issue); and Davis's Exhibits 101-111. A transcript (TR.) of the hearing was prepared and filed on April 30, 2026. (Filing No. 92). The matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge will recommend that Davis's motion be denied, and that Pretends-Eagle's motion be granted as to evidence obtained directly from her detention.

## BACKGROUND

The charges in the Indictment arise out of a narcotics investigation led by Officer Sundermeier, who has been employed with the City of Omaha Police Department for approximately 21 years. He is currently assigned to the narcotics unit, where he has been for about eight years. (TR. 24). In November 2024, Officer Sundermeier began investigating an individual named "Tycoon" after receiving information from an informant that he was selling fentanyl pills. (TR. 24).

Officers thereafter arranged for a controlled purchase of 500 fentanyl pills from Tycoon utilizing the same informant. The controlled purchase was audio and video recorded. (TR. 24-25). Officers observed the informant meet with Tycoon, who told the informant he did not have enough pills and that he needed to go to a second location to obtain more. Officers followed the informant to an apartment at 60th and Sorensen, the Prairie Spring Apartment Complex ("Prairie Spring"), and observed the informant meet back up with Tycoon, who was driving a gray Jeep Cherokee rental vehicle. A detective with the gang unit later identified Tycoon as Davis. (TR. 25-26, 68).

Officer Sundermeier contacted the rental vehicle company and learned the Jeep had been rented by Davis. The rental company also provided GPS records for the Jeep, reflecting it had traveled to the same locations as the controlled buy. (TR. 26).

After the controlled buy, law enforcement began surveilling Davis, including watching the apartment at Prairie Spring. (TR. 26). Law enforcement also spoke to the apartment manager, who granted officers access to the video systems. Officer Sundermeier testified the video from the day of the controlled buy showed Davis arrive at the apartment in a gray Jeep Cherokee, enter apartment #2107, and then exit a few minutes later. (TR. 27). Law enforcement identified the renter of apartment #2107 as an individual with a previous drug charge. (TR. 27). Officer Sundermeier testified it appeared Davis had been using the apartment as a stash house "based on him going there during the controlled buy to retrieve drugs and coming back and meeting with the informant." (TR. 44).

Officer Sundermeier testified that in the next two months of the surveillance of Davis, his "behaviors were consistent with someone who was still selling narcotics." (TR. 69). Specifically, Officer Sundermeier observed Davis meet up with persons for short amount of times in different locations, and observed one vehicle driving recklessly after meeting with Davis at the apartment

2

complex. Officer Sundermeier also noticed Davis switched vehicles frequently, between every week or two, which in his training and experience can be an attempt to avoid detection by law enforcement. (TR. 69, 72).

On January 8, 2025, Officer Sundermeier contacted Officer Keenan to conduct a free open air sniff in the Prairie Spring apartment complex. (TR. 76; Ex. 5). Officer Keenan has since retired, but on that date was employed as a K-9 handler with the Omaha Police Department. (TR. 75). He and his K-9, Dug, were state certified and trained at the relevant time. Dug was certified and trained to detect the odors of marijuana, cocaine, heroin and methamphetamine. (TR. 75-76). Officer Sundermeier testified he received permission from the apartment manager to bring the drug detection dog into the common area hallway. (TR. 27-28).

Officer Keenan testified he and Officer Sundermeier, both wearing plain clothes to look casual, went into the apartment complex and directed Dug to conduct sniffs on a series of doors in an apartment hallway without Officer Sundermeier identifying which door was a target. (TR. 76-77). Officer Sundermeier described the hallway as "one long hallway" with apartment #2107 towards the south end. (TR. 27-28). Dug indicated on apartment #2107 that there was an odor of narcotics coming from that apartment. (TR. 27-28, 77). Officers thereafter obtained a search warrant for apartment #2107. (TR. 28; Ex. 5).

The search warrant application and affidavit (Ex. 5) authored by Officer Sundermeier states law enforcement had reasonable grounds to believe evidence of illegal narcotics would be located at 6707 North 59th Court, Apartment 2107 in the Prairie Spring Apartment Complex. The affidavit recounted the details of the controlled buy between the CI and Davis in November 2024, including that Davis was driving a rental Jeep Cherokee to meet the CI, and that the Jeep's GPS tracking data reflects it drove to 6707 North 59th Court after Davis told the CI he needed to pick up more pills. It also contains the information that the apartment manager permitted law enforcement to review security video showing that on the date of the controlled buy, Davis arrived in a gray Jeep Cherokee, entered the exterior door to apartment #2107, and exited one minute later.

The affidavit included information from Detective Taylor, who advised that the FBI Safe Streets Task Force had "identified a potential stash location at an unknown apartment at 6707 North 59th Court" during a previous investigation in the summer of 2024, wherein Davis had delivered fentanyl pills to another distributer under investigation. The affidavit noted Davis has criminal history for drug offenses and was on probation for a flight to avoid arrest charge in 2024.

3

Davis reported to his probation officer he was staying at 4143 Burdette Street. The affidavit states that during Officer Sundermeier's surveillance in November and December, he observed Davis or "various vehicles rented by or associated with Davis" in the parking lot of these apartments on "numerous occasions." (Ex. 5 at pp. 2-3).

The affidavit continues that on January 7, 2025, Officer Sundermeier was conducting surveillance at Prairie Spring and observed a male driver of a white Tahoe enter the exterior door to apartment #2107. This male was identified as Daryesse Pond, who had previous arrests for drug possession and firearm possession. Fifteen minutes later, Pond exited apartment #2107 with Davis; Davis got into a white Dodge Ram and Pond drove away in the Tahoe. Officer Sundermeier attempted to follow Pond, but he "conducted multiple apparent counter-surveillance maneuvers including two U-turns to go the opposite direction." (Ex. 5 at p. 3).

According to the affidavit, Officer Sundermeier contacted the Prairie Spring Apartment manager in December 2024 and learned an individual named Carnell Watt had been the resident of apartment #2107 since 2019, and the electric bill was in her name. Watt had been convicted in 2001 for possession with intent to distribute crack cocaine, and in 2015 she was placed on a four-year term of probation for a federal conviction for conspiracy to distribute a controlled substance.

The affidavit recounts the drug dog sniff that occurred in the apartment hallway on January 8, 2025, with Officer Keenan and his certified drug dog, Dug, and that Dug gave a positive alert and indication to the odor of narcotics at the door to apartment #2107. A county court judge issued a search warrant for apartment #2107 based upon the above information.

After obtaining the search warrant, law enforcement continued to follow Davis using GPS and cell phone pings. (TR. 29). Officers knew Davis was on probation, and confirmed with his probation officer, Michael Borman ("Borman"), that Davis had an appointment with Borman scheduled for January 14, 2025. (TR. 30, 100). Officer Sundermeier testified he had talked to Borman "multiple times" since the investigation began. (TR. 70, 100).

Officer Sundermeier and several other officers waited outside the probation office on that date. (TR. 30). Officer Sundermeier testified he advised the other officers that Davis may be arriving in a black Jeep Renegade. (TR. 32, 45). Officer Sundermeier testified he did not see Davis arriving in a vehicle, and first observed him walking in the parking lot towards the building. (TR. 39). According to Officer Sundermeier's police report authored later, this was approximately 10:04 a.m. (Ex. 108; TR. 50).

4

Officer Sundermeier testified he circled the probation parking lot after Davis entered the probation office and saw a black Jeep Renegade with a female—later identified as Pretends-Eagle—in the driver's seat of the Jeep parked in the parking lot. Officer Sundermeier testified he recognized this Jeep Renegade, testifying he had witnessed Davis with the black Jeep Renegade during his surveillance on "multiple occasions," including at the Prairie Spring apartments and a business on North 42nd Davis frequented. (TR. 31, 36-37, 39, 43). Officer Sundermeier testified he had previously run the license plate of the Jeep Renegade in December or January, and found its registered address and owner, which he testified he thought was LeAnna Gordon."[1] (TR. 37, 40). Officer Sundermeier testified he could not say for certain whether he previously had observed Davis driving the black Jeep Renegade, just that he was a passenger. (TR. 46-47).

Officer Sundermeier testified he did not see Davis actually arriving in or exiting the Jeep Renegade at the probation office. Officer Sundermeier was also not sure whether he had seen Pretends-Eagle before, testifying he "possibly" observed her leaving a Runza with Davis as a passenger in the Jeep Renegade on a previous occasion during surveillance; Officer Sundermeier described that woman as a "lighter-skinned female." (TR. 41-42). Officer Sundermeier testified that if he had seen Pretends-Eagle prior to this probation parking lot encounter, "I did not know her name." (TR. 43).

Officer Sundermeier testified on cross-examination that his police report dated January 16, 2025, (Ex. 108) listed seven vehicles known to be associated with Davis as observed at the apartment during surveillance, but did not list the black Jeep Renegade as being surveilled at the apartment. (TR. 47-50). Officer Sundermeier testified he was unsure or did not recall if he previously documented his observations of the Jeep Renegade in his notes and reports during his two months of surveillance. (TR. 66-68). Review of the police reports received into evidence do not contain any reference to this Jeep Renegade prior to the events in the probation parking lot on January 14, 2025. Officer Sundermeier testified he previously wrote down his observations of this black Jeep Renegade during his surveillance, but did not have those notes or reports with him at the hearing. Officer Sundermeier also did not mention a Jeep Renegade in the search warrant affidavit. (TR. 40, 45-46). His police report authored after the January 14, 2025, events states that he did not see what car Davis arrived in, but that he had observed a Jeep Renegade he recognized from previous surveillance at the Jeep's registered address. (Ex. 108).

---

[1] Police reports and testimony reflect the registered owner was LeAnna Holbert. (Ex. 107; TR. 107-110).

Borman called Officer Sundermeier to advise that Davis had arrived, after which Officer Sundermeier and Detective Haley entered the office to make contact with Davis at approximately 10:04 a.m.. (TR. 30, 54). Borman testified he knew Davis was under investigation but did not know why. (TR. 101). Officer Sundermeier testified they spoke to Davis, introduced themselves and the reason for their visit, advised him of his rights, asked for permission to search his cell phone, and asked what vehicle he had arrived in. Davis responded he had arrived in an Uber, which Officer Sundermeier knew was not truthful given his observation of the Jeep Renegade. (TR. 30-31, 52-53, 102). Officer Sundermeier advised Davis of his *Miranda* rights at 10:10 a.m.; Davis declined to answer questions. (TR. 31). Officer Sundermeier patted Davis down and asked if they could search his phone, which he also denied. (TR. 53). Officer Sundermeier testified he placed Davis in handcuffs prior to the search of the Jeep Renegade, and "did not spend more than five minutes in that room with him before we came back outside." (TR. 54, 61). Borman testified he did not direct law enforcement to search Davis or his belongings. (TR. 102-103).

After speaking to Davis, Officer Sundermeier directed officers to make contact with the female driver of the Jeep Renegade in the parking lot and to "see if they could find a reason to search it," and because he wanted a drug dog to be deployed. (TR. 55-56, 63, 72).

Officer Keenan was on duty and was contacted to assist with the investigation of the Jeep Renegade in the probation office parking lot. (TR. 78, 83-84). Officer Keenan was advised by the other officers that the driver was an unidentified black female. (TR. 87-88). Officer Keenan's body worn camera recorded his contact with the Jeep Renegade and his deployment of Dug. (TR. 78-79; Ex. 1-2). Officer Keenan testified when he arrived, he pulled into the parking lot at an angle behind the Jeep, which was still running. (TR. 79; Ex. 103).

Officer Keenan's body cam reflects he immediately approached the driver's side door of the Jeep and opened it and directed the driver, later identified as Pretends-Eagle, to step out of the vehicle. Officer Keenan patted the driver down and placed her in handcuffs. (Ex. 1 at 0:38-1:06). Officer Keenan told her she was being detained for the investigation, but that she was not under arrest. (TR. 80; Ex. 103). Officer Keenan testified he detained Pretends-Eagle "based on the request from the . . . narcotics officers," asked her for identification, brought her back to his police vehicle, and conducted a roadside interview about what she was doing there, whose car she was driving, and the like. (TR. 79). Pretends-Eagle said she came there with a friend but was reluctant to state his name. She also indicated she was an Uber driver, but later stated she was there with

6

"Ty" (Davis), who is her child's father.  Pretends-Eagle was handcuffed and placed in Officer Keenan's vehicle in the front seat.  (TR. 79; Ex. 1 at 0:55-1:30, 3:30-3:50).  Officer Keenan observed a bulge in her pants leg pocket, which was a large amount of cash.  (Ex. 1:30-1:45). Officer Keenan searched her purse for weapons.  (Ex. 1 at 1:50-2:10).  Pretends-Eagle did not have identification and stated she had $5,000.  (Ex. 1 at 2:10-2:20).  Pretends-Eagle was asked if the Jeep was hers, and she replied that it was her friend's vehicle.  She appeared hesitant to give the name of her friend but answered, "Quay," which did not match the name on the vehicle's registration.  (Ex. 103; Ex. 1 at 5:05-5:30).  Pretends-Eagle did not have identification or a driver's license.  (Ex. 103; Ex. 1 at 3:35-4:10).  Pretends-Eagle stated she had the Jeep for a few days, denied having anything illegal in it, and that she was responsible for the items in it. Pretends-Eagle denied consent to search and denied consent to have a drug dog conduct a sniff.  (Ex. 103; Ex. 1 at 7:40-8:10, 9:20-10:20).

Officer Keenan determined to deploy Dug to conduct a sniff of the Jeep based on his "years of experience and training" because Pretends-Eagle did not have a driver's license, she did not know whose car it was, she was untruthful about why she was there, and then indicated she was there with Davis.  (TR. 93-94).

Officer Keenan deployed Dug on a leash counterclockwise around the Jeep starting at the front driver's side of the vehicle.  Officer Keenan testified that as he came around the driver's side passenger door, Dug "alerted to the odor of narcotics with strong nasal and then indicated with a sit at the door[.]"  (TR. 80; Ex. 1 at 12:40-13:00).  Officer Keenan relayed Dug's positive indication to the other officers, who then searched the Jeep.  (TR. 58-59, 80-81; Ex. 1 at 13:00-13:25). The search resulted in the recovery of fentanyl pills, a firearm, and other smaller amounts of drugs. (TR. 32; Ex. 103, 105, 107).  Officer Sundermeier testified he had no contact with Pretends-Eagle at the scene.  (TR. 33).  One blue pill with an M30 stamp believed to be fentanyl was found in Davis's wallet.  (Ex. 106).

Davis was placed under arrest and transported "to a different location where we were intending to serve the search warrant at the apartment complex."  (TR. 31; Ex. 106).  No one was inside the apartment at the time of the search.  (Ex. 108).  Davis asked why he was brought to the apartment because  "he did not live here."  Officer Sundermeier replied Davis "had been seen staying the night here on multiple occasions."  (Ex. 108 at p. 9).  Davis replied that "did not mean he lived there."  The search of the apartment recovered evidence of narcotics distribution.  Once

7

the search of the apartment was complete, Davis was "booked for possession of controlled substance." (TR. 32).

Anita White-Martin ("Anita") testified her daughter, LeAnna Holbert ("LeAnna"), had been dating Davis, and owned a black Jeep Renegade. Anita testified LeAnna was hospitalized in November 2024 until she passed away in March 2025. (TR. 107-110). Anita testified Davis was "staying with" LeAnna and bringing her "whatever she needed[.]" (TR. 109). Anita testified she believed LeAnna loaned her vehicle to Davis during that time because he "had it" and used it to take LeAnna to and from the hospital. (TR. 110). Anita testified she "only talked to LeAnna about the car when they arrested [Davis]." (TR. 110). Because LeAnna was still in the hospital, she asked Anita to get her Jeep after Davis's arrest. (TR. 111). Anita testified she believed Davis had permission to use the Jeep while LeAnna was in the hospital. (TR. 111).

Davis and Pretends-Eagle are now charged in a four-count Indictment with: (1) conspiracy to distribute fentanyl in violation of 21 U.S.C. §§ 841(a)(l) and 841(b)(l); (2) possession of a firearm by a prohibited person (Davis) in violation of 18 U.S.C. §§ 922(g)(l) and 924(a)(8); (3) possession of a firearm by a prohibited person (Pretends-Eagle) in violation of 18 U.S.C. §§ 922(g)(l) and 924(a)(8); and 4) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). (Filing No. 1). Both defendants have moved to suppress the evidence obtained during the course of the investigation supporting the charges, asserting numerous Fourth Amendment violations occurring in connection with the search of apartment #2107, and their detentions and search of the Jeep Renegade at the probation office.

Davis contends his Fourth Amendment rights were violated by the search of his person at the probation office following his warrantless arrest on January 14, 2025; by the warrantless search of the Jeep Renegade in the probation office parking lot on January 14, 2025; and by the search of apartment #2107 because the drug dog's sniff of the apartment hallway was "unconstitutional either as a physical intrusion on the curtilage of his residence, or as a violation of his reasonable expectation of privacy in the area immediately outside his apartment door." (Filing No. 47). Davis argues he was unlawfully seized, searched, and arrested at the probation office on January 14, 2025. He further argues there was an illegal seizure and search of the black Jeep in the parking lot of the probation office on the same date. Davis additionally argues his Fourth Amendment rights were violated both by the dog sniff in the hallway outside the apartment on January 8, 2025, and that the execution of the search warrant obtained as a result of the positive indication of that drug

8

canine is fruit of the poisonous tree. (TR. 14-15). Davis also raises the issue of whether the drug canine was properly certified and reliable. (TR. 15-16).

Davis's motion with respect to the search of apartment #2107 and the search of the Jeep Renegade raise a threshold question of standing. The government asserts Davis does not have standing to challenge the search of the apartment because it is not his apartment; rather, it is "a stash house that is owned by another individual that he has access to when he goes to get drugs." (TR. 13). Davis asserts standing with regard to the apartment both at the time of the dog sniff and at the time of the execution of the search warrant. (TR. 12). The government also argues in its brief that Davis does not have standing to challenge the search and seizure of the Jeep Renegade because he did not own the Jeep and it was not searched pursuant to his probation search clause. (Filing No. 53 at pp. 6-7). Davis asserts he has standing to challenge the seizure and search of that vehicle as a bailee because he was given permission and license to use the Jeep for whatever purpose during the time it was searched. Davis argues he was given permission to drive the vehicle from its then-owner, Leanna Holbert, and Davis then gave permission to Pretends-Eagle to drive the vehicle. (TR. 6-8).

Pretends-Eagle contends she was subjected to an unreasonable seizure in the probation office parking lot because she was detained without reasonable suspicion to believe that a crime was being committed or about to be committed, and that any evidence and statements obtained from her illegal detention should be suppressed as fruit of that Fourth Amendment violation. (TR. 17-18). Specifically, Pretends-Eagle asserts that at the time she was detained, the only information officers had supporting reasonable suspicion was that officers may have observed Davis in the vehicle months before during surveillance, but that officers did not know who Pretends-Eagle was or otherwise have any reason to believe she was involved in criminal activity. (Filing No. 58). The government does not contest Pretends-Eagle's standing to challenge the seizure of the vehicle and her person. (TR. 4-5).

**ANALYSIS**

I.      **Standing**

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV.

9

Fourth Amendment rights are personal and may not be asserted vicariously. See *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004) (citing *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978)). "An individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'" *Barragan*, 379 F.3d at 529 (citing *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)); *Rakas*, 439 U.S. at 133-34).

"The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched." *United States v. Maxwell*, 778 F.3d 719, 732 (8th Cir. 2015) (quoting *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)). A defendant must "present evidence of his standing, or at least point to specific evidence in the record which the government presented that established his standing." *Maxwell*, 778 F.3d at 732 (internal quotations and alterations omitted). "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched, he has no standing to claim that they were searched or seized illegally." *Barragan*, 379 F.3d at 529-30 (citing *Gomez*, 16 F.3d at 256 (8th Cir. 1994)). Ultimately, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134. Factors relevant to standing include:

> ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*Gomez*, 16 F.3d at 256 (8th Cir. 1994) (citing *United States v. Sanchez*, 943 F.2d 110, 113 (1st Cir. 1991)). The defendant bears the burden to establish standing by a preponderance of the evidence. See *United States v. Bettis*, 946 F.3d 1024, 1027 (8th Cir. 2020) (citing *United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015)).

### a. Davis's Challenge to the Search of the Jeep Renegade

As an initial matter, the undersigned magistrate judge is not convinced Davis established standing to challenge the search of the Jeep Renegade in the probation office parking lot. First, Davis was not driving the Jeep, nor was he the registered owner and did not demonstrate he otherwise had a property interest in it. "Generally, a mere passenger does not have standing to

challenge a vehicle search where he has 'neither a property nor a possessory interest in the automobile.'" *Anguiano*, 795 F.3d at 878 (quoting *Rakas*, 439 U.S. at 148). Officer Sundermeier testified that during his surveillance he only saw Davis as a passenger in the Jeep Renegade, which was registered to a LeAnna Holbert. Davis was also just a passenger on the date of the search. See *United States v. Marquez*, 605 F.3d 604, 609 (8th Cir. 2010) (holding defendant lacked standing where he "neither owned nor drove" the vehicle and only was "an occasional passenger therein"); *United States v. Green*, 275 F.3d 694, 698-99 (8th Cir. 2001) (holding defendant lacked standing where he was a passenger in a car driven by another); *United States v. Green*, 275 F.3d 694, 699 (8th Cir. 2001) (passenger with no possessory or property interest in a vehicle "that would enable him to directly challenge the search" may still "contest the lawfulness of his own detention and seek to suppress evidence as the fruit of his illegal detention.").

A "defendant must present at least some evidence of consent or permission from the lawful owner/renter [of a vehicle] to give rise to an objectively reasonable expectation of privacy." *United States v. Russell*, 847 F.3d 616, 619 (8th Cir. 2017) (citing *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995)). The Jeep Renegade's registered owner, LeAnna, has since passed away, but LeAnna's mother Anita testified that Davis was LeAnna's boyfriend and "believed" LeAnna gave Davis permission to drive it while LeAnna was in the hospital, based upon the fact that Davis "had it." Anita did not conclusively testify that LeAnna had given permission to Davis to drive the Jeep, as Anita testified she "only talked to LeAnna about the car when they arrested [Davis]," and that was to ask Anita pick up the Jeep. (TR. 110-111). At best, Anita established that LeAnna acquiesced in Davis driving her Jeep; however, Pretends-Eagle was the driver at the time of the drug dog deployment and subsequent search. There is no evidence to indicate LeAnna's tacit permission to Davis extended to another woman involved with Davis, and Davis was not in or around the Jeep at the time law enforcement approached it.

Nevertheless, assuming Davis has standing to challenge the search of the Jeep Renegade, the record does not establish that Davis's Fourth Amendment rights were violated by its search. "Under the automobile exception to the Fourth Amendment, an officer may search a vehicle without a warrant if he has probable cause." *United States v. Pacheco*, 996 F.3d 508, 513 (8th Cir. 2021). The automobile exception extends to parked cars because "[i]t is the characteristic mobility of all automobiles, not the relative mobility of the car in a given case, that gives rise to the *Ross* standard which allows for warrantless searches when probable cause exists." *United States v.*

11

*Perry*, 925 F.2d 1077, 1080-81 & n.4 (8th Cir. 1991) (applying the exception to vehicle parked in a school parking lot with already-arrested occupants at the time the search was conducted); *United States v. Short*, 2 F.4th 1076, 1079 (8th Cir. 2021) (concluding the smell of marijuana gave officers probable cause to warrantlessly search vehicle with a flat tired parked in apartment parking lot).

This was not a traffic stop initiated by law enforcement; Pretends-Eagle was parked in the driver's seat of the Jeep Renegade in a parking lot at the probation office, and Davis had already exited the vehicle and entered the probation office building before Officer Keenan approached the parked Jeep. The testimony adduced at the hearing reflect Officer Keenan's drug detection dog, Dug, was walked around the outside of the Jeep and indicated to the odor of narcotics on the passenger side door. Officer Keenan testified that on this date, Dug was state certified and trained to detect the odors of marijuana, cocaine, heroin and methamphetamine. A drug canine's alert establishes probable cause for a search and is "presumptively reliable at detecting illicit drugs . . . if the dog has satisfactorily completed a bona fide certification or training program." *United States v. Collier*, 116 F.4th 756, 761 (8th Cir. 2024). Davis offered nothing to show this certification or training was inadequate. See *Collier*, 116 F.4th at 761 (a drug canine's presumption of reliability "may be overcome if a defendant can show, either through cross-examination or introducing his own fact or expert witness, the inadequacy of a certification or training program or that the circumstances surrounding a canine alert undermined the case for probable cause."). Accordingly, the warrantless search of the Jeep was supported by probable cause following the certified drug dog's indication to the odor of narcotics.[2]

### b. Davis's Standing to Challenge Drug Dog Sniff and Subsequent Execution of Search Warrant at Apartment #2107

The undersigned magistrate judge further finds Davis has not established standing to challenge the drug dog sniff and subsequent search of apartment #2107 pursuant to a search warrant. The renter of apartment #2107 was an individual named Carnell Watt, who had lived there since 2019. The electric bill was in Watt's name. The record contains no evidence of the relationship, if any, between Davis and Watt. Davis reported to his probation officer he was

---

[2] Davis's probation officer did not direct law enforcement to search Davis's person or the vehicle pursuant to the terms of Davis's probation, (TR. 102-103; Ex. 101), and neither the Government nor law enforcement officers take the position that any of the searches were conducted pursuant to Davis's probation order. (Filing No. 53 at pp. 16-17; TR. 58, 71).

staying at 4143 Burdette Street, not apartment #2107 at the Prairie Spring Apartments on 60th and Sorensen. Davis denied living at apartment #2107 when Officer Sundermeier told him he had been seen there on multiple occasions. (Ex. 108 at p. 9). Officer Sundermeier testified to his observations of Davis coming and going from the apartment in different vehicles and engaging in conduct that was consistent with using apartment #2107 as a stash house. (TR. 44); see, e.g., *United States v. Sawyer*, No. 4:24-CR-267-SEP-NCC, 2025 WL 2952283, at *4 (E.D. Mo. Sept. 8, 2025), *r&r adopted*, No. 4:24-CR-00267-SEP, 2025 WL 2962498 (E.D. Mo. Oct. 17, 2025) ("A defendant does not have a reasonable expectation of privacy in a 'stash house' that is the residence of another.") (citing *United States v. Huerta*, No. 2:08-CR-102(01), 2009 WL 5065694, at *1-2 (E.D. Tenn. Dec. 16, 2009) (finding the defendant's use of another's trailer "as a storage bin for marijuana" or "stash house" did not give him a reasonable expectation of privacy in it) (citing *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999)); see also *United States v. Nabors*, 761 F.2d 465, 468 (8th Cir. 1985) (recognizing a "'casual visitor' to a house does not possess a legitimate expectation of privacy sufficient to challenge [a] search").

Davis suggests in his brief he has standing as an overnight guest; however, there was no testimony and little evidence introduced at the hearing to support that assertion.[3] (Filing No. 47 at p. 6); see *United States v. Davis*, 361 F. App'x 704, 705 (8th Cir. 2010) (finding the defendant failed to establish standing because "the evidence did not show that [the defendant] either lived or stayed more than irregularly at his uncle's residence, that he stored personal effects there which he admitted to owning, or that he had exclusive access to or had taken precautions to maintain privacy in the gun cabinets or the room where the ammunition was found."). "There is no 'single metric or exhaustive list of considerations,' but a defendant's expectation of privacy must be grounded in property law or understandings that are recognized by society." *United States v. Bettis*, 946 F.3d 1024, 1027 (8th Cir. 2020) (quotation omitted). On the record before the Court, Davis did not meet his burden to show he has an ownership interest, control over, or a reasonable expectation of privacy in apartment #2107 at the time of the drug dog sniff on January 8, 2025, or at the times the search warrant was issued and executed. As such, the undersigned magistrate

---

[3] There is a single reference in Officer Sundermeier's police report relevant to Davis's standing: during the execution of the search warrant Davis asked Officer Sundermeier why he was brought to the apartment because "he did not live here." Officer Sundermeier said to Davis he "had been seen staying the night here on multiple occasions." Davis replied that "did not mean he lived there." (Ex. 108 at p. 9).

judge finds Davis lacks standing to challenge the constitutionality of the drug dog sniff and execution of the search warrant with respect to apartment #2107.

## II.    The Drug Dog Sniff and Resulting Search Warrant for Apartment #2107

Alternatively, even assuming Davis has standing to challenge the drug dog sniff of the common hallway to apartment #2107, current precedent within this district and the Eighth Circuit does not consider this a violation of the Fourth Amendment, and has applied the *Leon* good faith exception to excuse searches conducted pursuant to search warrants issued in reliance on such dog sniffs.  As such, Davis's motion challenging the dog sniff and search conducted pursuant to a warrant should also be denied on its merits.

In *United States v. Scott*, the Eighth Circuit Court of Appeals held that a dog sniff of an "apartment door frame from a common hallway d[oes] not constitute a search subject to the Fourth Amendment" because a defendant has "no legitimate privacy interest in the illegal drugs that [the dog's] sniff detected." 610 F.3d 1009, 1016 (8th Cir. 2010).  This holding derives from the reasonable-expectations test from *Katz v. United States*, 389 U.S. 347 (1967).  The *Scott* decision predates *Florida v. Jardines*, 569 U.S. 1 (2013), which gave rise to a separate "trespass to curtilage" test.  In *Jardines,* the Supreme Court held that bringing a drug dog onto someone's front porch to sniff into their home intruded on the homeowner's curtilage.[4] 569 U.S. at 6-7.  However, Eighth Circuit decisions as recently as last year recognize it still has "neither expressly overruled *Scott* nor explained how *Jardines* applies to apartment doors in a common hallway." *United States v. Peck,* 131 F.4th 629, 632 (8th Cir. 2025), *reh'g denied*, No. 24-1198, 2025 WL 1454974 (8th Cir. May 21, 2025), *and cert. denied*, 223 L. Ed. 2d 564 (Jan. 20, 2026) (citations omitted). Instead, the Eighth Circuit has held in three recent cases that the *Leon* good faith exception applies to search warrants obtained from drug dog sniffs in apartment hallways because "[i]t was

---

[4] "[W]hether a particular area is part of the curtilage of an individual's residence requires consideration of factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Hopkins*, 824 F.3d 726, 731 (8th Cir. 2016) (quoting *United States v. Bausby*, 720 F.3d 652, 656 (8th Cir. 2013)).  The court considers four factors to determine if an area is curtilage (the "*Dunn* factors"): (1) the proximity to the home of the area claimed to be curtilage, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by. *Bausby*, 720 F.3d at 656 (quoting *United States v. Dunn*, 480 U.S. 294, 301  (1987)). The factors "are not mechanically applied and are considered together." *Hopkins*, 824 F.3d at 731.

reasonable for the officers to rely on our then-applicable precedent that dog sniffs at an interior apartment door are permissible." *Peck*, 131 F.4th at 631 (citing *United States v. Perez*, 46 F.4th 691, 697 (8th Cir. 2022) *and United States v. Hines*, 62 F.4th 1087, 1092-93 (8th Cir. 2023)).[5]

The circumstances of this case are not meaningfully different from the circumstances of the apartment hallway dog sniffs in *Peck*, *Perez*, and *Hines*, and the Eighth Circuit still has not explicitly overruled *Scott* or explained how *Jardines* applies to apartment doors in common hallways. Here, Officer Keenan and Officer Sundermeier walked a drug dog through a common hallway of an apartment complex with permission from the apartment complex manager. There is no evidence the drug dog's nose went under apartment #2107's door or that officers otherwise effected a physical trespass into the apartment. Officers then obtained a searched warrant for apartment #2107. See *Peck,* 131 F.4th at 632 ("When [law enforcement officers] visited [the defendant's] apartment complex in 2020, it was objectively reasonable for them to rely on *Scott* and use a drug dog to sniff [the defendant's] apartment door. Nor does any fact meaningfully distinguish [the defendant's] case from the circumstances present in *Perez* and *Hines*; for example, there is no evidence in the record that [the drug dog's] nose went under [the defendant's] door or that the Officers otherwise effected a physical trespass into his apartment."). As such, regardless of whether the apartment hallway is, in fact, curtilage, the *Leon* good faith exception applies to the search warrant for apartment #2107 obtained from the drug dog sniff in the apartment common hallway. See, e.g., *Peck,* 131 F.4th at 632. Therefore, Davis's motion to suppress evidence obtained from the search of apartment #2107 pursuant to a warrant should be denied.

### III.    Search of Davis's Person

Davis further argues his Fourth Amendment rights were violated by the search of his person at the probation office following his warrantless seizure and arrest on January 14, 2025. Davis argues he was seized without reasonable suspicion or probable cause because the alleged controlled buy with the CI occurred two months earlier and was therefore stale information. Davis further asserts "The K9 sniff and surveillance of an apartment that [Davis] did not lease, and which

---

[5] Justice Kelly has written in concurrences that she would consider common apartment hallways curtilage under the *Dunn* factors, but does not disagree that the *Leon* good faith exception applies in these circumstances. See *Perez*, 46 F.4th 691, 704-07 (Kelly, J., concurring).

contained an unknown number of occupants, did not provide sufficient investigative corroboration giving rise to reasonable suspicion or probable cause." (Filing No. 47 at pp. 9-10).

"A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause." *United States v. Guevara*, 731 F.3d 824, 832 (8th Cir. 2013) (citation omitted). "An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *United States v. Mathes*, 58 F.4th 990, 993 (8th Cir. 2023) (quoting *United States v. Torres–Lona*, 491 F.3d 750, 755 (8th Cir. 2007). The court considers "the totality of the circumstances known to the officers at the time of arrest." *Id.* In determining probable cause, courts "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Britton*, 101 F.4th at 542. (quoting *United States v. Winarske*, 715 F.3d 1063, 1066 (8th Cir. 2013)). "Arresting officers are not required to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest." *Id.* (quoting *Winarske*, 715 F.3d at 1067). "Instead, the mere probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, is all that is required." *Id.*

Considering the totality of the circumstances, the undersigned magistrate judge finds law enforcement officers had sufficient probable cause to arrest Davis at the probation office.[6] The evidence before the Court establishes that prior to Davis's arrest, law enforcement conducted a two-month investigation into a tip from a confidential informant that an individual named "Tycoon" was selling fentanyl pills. Law enforcement arranged an audio-visually recorded controlled buy from Tycoon utilizing the same informant in November 2024; Tycoon then provided the informant with 500 fentanyl pills after stopping at apartment #2107 in the Prairie Spring Apartment Complex to acquire more. Tycoon was identified as Davis by a gang unit detective familiar with Davis from a narcotics investigation in the summer of 2024 wherein Davis had delivered fentanyl pills to another distributor under investigation. That detective also

---

[6] Officer Sundermeier's warrantless arrest affidavit (Ex. 106) describes the results of the search of the Jeep Renegade and could possibly be construed to suggest Davis was arrested after drugs and a firearm were located within it. However, the record establishes Officer Sundermeier placed Davis in handcuffs within six minutes of making contact with him in the probation office, prior to the search of the Jeep, (TR. 61), and therefore probable cause for Davis's arrest should be analyzed prior to Officer Keenan's contact with Pretends-Eagle or the search of the Jeep.

identified a potential stash location at an apartment in the Prairie Spring Apartment Complex from that earlier investigation. Davis has prior criminal history for drug offenses, and was on probation for flight to evade arrest, and the renter of apartment #2107 also had a previous drug charge. After the November 2024 controlled buy, Officer Sundermeier conducted surveillance of Davis, noting that in his training and experience, Davis's "behaviors were consistent with someone who was still selling narcotics," such as meeting with individuals for short amount of times in different locations, and switching vehicles frequently. "An officer's training and experience should be taken into account when determining probable cause." *United States v. Mims*, 122 F.4th 1021, 1031 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 2861 (2025).

On January 7, 2025, Officer Sundermeier observed an individual with previous arrests for drug possession and firearm possession enter apartment #2107 for a short time, and then leave with Davis; when Officer Sundermeier attempted to follow the other individual, the individual began taking several turns in an apparent attempt to evade surveillance. On January 8, 2025, a drug canine indicated to the odor of narcotics coming from apartment #2107, where Davis had gone to retrieve more fentanyl pills to provide to the confidential informant during the November 2024 controlled buy. So, although the investigation may have started in November 2024 with a controlled buy, law enforcement's ongoing narcotics investigation made it evident that Davis's narcotics dealing activities were active and ongoing as of January 14, 2025, when he was arrested. Therefore this "lapse" in time does not render the information stale. See *United States v. Ortiz-Cervantes*, 868 F.3d 695, 700 (8th Cir. 2017) ("In investigations of ongoing narcotics operations, intervals of weeks or months between the last described act . . . [do] not necessarily make the information stale . . . and a lapse of time is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated[.]") (internal quotation marks and citations omitted). The events leading up to Davis's arrest, in their totality, would lead a reasonable person to believe that Davis has committed or was committing a drug crime, and therefore his warrantless arrest did not violate the Fourth Amendment.

Because officers had probable cause to arrest Davis for a drug offense, the subsequent search of his person was an authorized search incident to arrest. *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (A search incident to arrest is "among the exceptions to the warrant requirement" and "derives from interests of officer safety and evidence preservation."); *Chimel v. California*, 395 U.S. 752, 763 (1969) ("[I]t is entirely reasonable for [law enforcement] to search for and seize any

17

evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items."). Therefore, the undersigned magistrate judge recommends Davis's motion to suppress be denied with respect to his arrest and subsequent search of his person.

### IV.    Pretends-Eagle's Detention

Pretends-Eagle moves to suppress all evidence and statements obtained from her contact with law enforcement, arguing it is the product of an illegal detention unsupported by reasonable suspicion. (Filing No. 58). Pretends-Eagle asserts that Officer Keenan effected a seizure by parking his patrol vehicle directly behind the Jeep, immediately opening the driver's side door, and handcuffing her, all without reasonable suspicion. The undersigned magistrate judge agrees.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A warrantless seizure "is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions." *United States v. Lewis*, 864 F.3d 937, 943 (8th Cir. 2017) (quoting *Coolidge v. N.H.*, 403 U.S. 443, 474 (1971)). The Fourth Amendment permits brief investigative stops when law enforcement has reasonable, articulable suspicion that the person stopped is, or is about to be, engaged in criminal activity. See *United States v. Slater*, 979 F.3d 626, 629 (8th Cir. 2020). In determining whether an officer had reasonable suspicion, courts "look at the totality of the circumstances, allowing officers to draw on their experience and training." *United States v. Lawhorn*, 735 F.3d 817, 820 (8th Cir. 2013) (citation omitted).

Officers are permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Davison*, 808 F.3d 325, 329 (8th Cir. 2015) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "When a team of law enforcement officers is involved in an investigation, the issue is whether all the information known to the team provided 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the investigative stop." *United States v. Collins*, 883 F.3d 1029, 1032 (8th Cir. 2018) (quoting *United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007)). "Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of

18

the suspect parties, and the parties' behavior when they become aware of the officer's presence." *Id.* (quoting *United States v. Quinn*, 812 F.3d 694, 697-98 (8th Cir. 2016)).

The undersigned magistrate judge finds Officer Keenan effectuated a seizure of Pretends-Eagle by parking his patrol vehicle behind the Jeep, immediately ordering her to exit the vehicle, and frisking and handcuffing her. Officer Keenan's body camera video reflects this occurred within the first thirty-five seconds after he parked his police cruiser behind the Jeep. (Ex. 1 at 0:30-1:05). The Jeep was in a parking stall in front of a median, and was effectively blocked in by Officer Keenan's patrol vehicle. Although Pretends-Eagle subsequently made many statements to provide officers with reasonable suspicion to believe she was involved in criminal activity, the question before the Court is whether there was reasonable suspicion to believe Pretends-Eagle was engaged in criminal activity and was armed and dangerous at the time her detention was effectuated. Even considering the "lower threshold" required to establish reasonable suspicion, the undersigned magistrate judge finds the Fourth Amendment did not permit Pretends-Eagle to be detained in this manner.

First, at the time Pretends-Eagle was detained, none of the investigating officers knew her identity. Officer Sundermeier was unsure if he had observed her with Davis during his two months of surveillance, testifying only that he saw a light-skinned female leaving a Runza with Davis on a previous occasion, which could "possibly" have been Pretends-Eagle. (TR. 41-42). But, it could also have been LeAnna Holbert, who was the registered owner of the Jeep. At the time Pretends-Eagle was detained, she was parked in an idling vehicle in the state probation office parking lot shortly after 10:00 a.m., inherently not a suspicious time, place, or activity. No officer actually saw Davis in the Jeep or exit the Jeep in the probation parking lot. Additionally, there was no evidence that Pretends-Eagle was observed committing a traffic infraction or other criminal offense, and therefore officers did not have a separate basis to detain her for investigation.

Officer Sundermeier testified he drove around the probation parking lot after he saw Davis enter the probation office, and recognized the Jeep from his surveillance. But the only tie to criminal activity articulated in the record is Officer Sundermeier's testimony that he had observed Davis as a passenger in the Jeep Renegade during his previous surveillance, including at the Prairie Spring Apartment Complex. But while Officer Sundermeier's police reports and the search warrant affidavit authored prior to January 14, 2025, identify multiple vehicles associated with Davis during surveillance at the Prairie Spring Apartments, including a Dodge Durango, white

19

Dodge Ram, Ford Edge, and a silver Impala, the Jeep Renegade at issue was never mentioned as being one of those vehicles. (Ex. 108 at p. 7; Ex. 5; TR. 47-50). Officer Sundermeier testified he was unsure or did not recall if he previously documented his observations of the Jeep Renegade in his notes and reports during his two months of surveillance, but if he did, those reports were not offered into evidence at the suppression hearing. (TR. 66-68).

The "ultimate touchstone" of the Fourth Amendment is "reasonableness." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). The undersigned magistrate judge finds Pretends-Eagle's detention was unreasonable under the Fourth Amendment. Without knowing her identity or articulating any specific belief that Pretends-Eagle was engaged in criminal activity, Officer Keenan immediately removed her from the Jeep, patted her down, and handcuffed her. "[F]or the use of handcuffs during a *Terry* stop" to constitute reasonable force, an officer must have an objectively "reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose." *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005)). The Fourth Amendment also allows officers to conduct a protective frisk of the individual for weapons, but only if they have "reasonable suspicion that [the] person with whom [they are] dealing might be armed and presently dangerous." *United States v. Slater*, 979 F.3d 626, 629 (8th Cir. 2020) (citation omitted). Here, the government "fails to point to specific facts supporting [an objectively reasonable] concern for officer safety" justifying the protective frisk and handcuffing of Pretends-Eagle under the circumstances of this case. *El-Ghazzawy*, 636 F.3d at 458.

Neither the government's briefing nor the testimony at the hearing allege they had a reasonable belief that Pretends-Eagle was armed or dangerous or that another legitimate purpose necessitated the use of handcuffs. The tenuous connection between Officer Sundermeier's testimony that he observed Davis as a passenger in the Jeep Renegade at some point in the prior two months fails to support reasonable suspicion that Pretends-Eagle was engaged in criminal activity and was armed and dangerous at the time she was handcuffed and frisked. Had Pretends-Eagle been waiting for Davis in the Jeep in the parking lot of the Prairie Spring Apartment Complex late at night, the undersigned magistrate judge's conclusion might be different. But the circumstances here—driving Davis to his scheduled appointment with his probation officer— simply do not provide a reasonable belief Pretends-Eagle was involved in criminal activity.

Accordingly, the undersigned magistrate judge finds Pretends-Eagle's Fourth Amendment rights were violated by her detention in this case.

"Evidence obtained in violation of the Fourth Amendment is subject to the exclusionary rule and, therefore, 'cannot be used in a criminal proceeding against the victim of the illegal search and seizure.'" *United States v. Miller*, 11 F.4th 944, 954 (8th Cir. 2021) (quoting *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011)). "The exclusionary rule extends to evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." *United States v. Tuton*, 893 F.3d 562, 568 (8th Cir. 2018) (citation omitted). Because law enforcement obtained incriminating statements and items of evidentiary value from Pretends-Eagle's person directly from her illegal detention and frisk without reasonable suspicion she was armed and dangerous, they should be suppressed as evidence against her as fruit of the poisonous tree. See *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

However, the undersigned magistrate judge finds the drug dog sniff and indication to the odor of narcotics of the Jeep and resulting warrantless search were not direct products of Pretends-Eagle's illegal detention. See *United States v. Riesselman*, 646 F.3d 1072, 1079 (8th Cir. 2011) (Evidence must be suppressed only if the "illegality is at least a but-for cause of obtaining the evidence."). Officers had not effectuated a traffic stop of the Jeep, which was parked in a public parking lot. Davis had just been arrested inside the probation office for a drug offense, and Officer Sundermeier's testimony establishes that Davis was seen as a passenger in the Jeep during his surveillance, and likely had arrived at that meeting in the Jeep. Given Davis's arrest, officers were pursuing further investigation into Davis, including having Officer Keenan deploy his drug canine around the vehicle Davis had just exited, regardless of who was in the driver's seat. See *United States v. Smith*, 21 F.4th 510, 517 (8th Cir. 2021) ("Under [the inevitable discovery] doctrine, 'the government must prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation.'"); *United States v. Baez*, 983 F.3d 1029, 1037 (8th Cir. 2020) (noting inconsistent application of the inevitable discovery doctrine, sometimes concluding "it is sufficient that the evidence would have been acquired lawfully but for the constitutional violation."). As outlined above, the automobile exception applies to warrantless searches of parked vehicles if officers have probable cause. See *Short*, 2 F.4th at 1079. Officer

21

Keenan's drug dog was walked around the outside of the parked Jeep in a public parking lot, and indicated to the odor of narcotics on the passenger side door, which provided probable cause for its search. *Collier*, 116 F.4th at 761. Because Pretends-Eagle's unlawful detention was separate from and did not result in the probable cause supporting the search of the Jeep, evidence resulting from the search should not be suppressed as to her. Upon consideration,

**IT IS HEREBY RECOMMENDED** to Robert F. Rossiter, Jr., Chief United States District Court Judge, that

1. Defendant Tyree Davis's Motion to Suppress be denied; and
2. Defendant Alanta Pretends-Eagle's Motion to Suppress be granted as to evidence and statements flowing directly from her illegal detention.

Dated this 1st day of June, 2026.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.